**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jes Solar Company Limited, et al., | No. CV-12-00626-TUC-DCB |
| Plaintiffs, | **ORDER** |
| v. | |
| Matinee Energy Incorporated, et al., | |
| Defendants. | |

On February 12, 2018, this Court's entry of default judgment and an award of damages was reversed, and the case was remanded for disposition on the merits. The Court grants summary judgment for Defendants Kim and Chung.

<u>Case History</u>

This case was summarized by the Ninth Circuit Court of Appeals, as follows:

> Plaintiffs, a group of contractors, contracted with Defendant Corporations Matinee Energy, Inc. and Samsun, LLC to—they believed—construct a multi-billion-dollar solar power project. In reality, no project existed. They filed this action for breach of contract, unjust enrichment, conspiracy, fraudulent inducement, and conversion to recover the money they paid into the project.

On remand, default remains against Defendants Matinee Energy, a corporation, Paul Jeoung, President of Matinee Energy, and John S. Lee, owner of Defendant Samsun, a corporation. Defendant Chun Rae Kim[1] has been dismissed

---

[1] Previously, the Court in its Orders and the parties in the pleadings referred to Defendant Tong Soo Chung by his family name "Tong" and referred to Defendant S. Chin Kim by his family name "Chin." There should be no confusion between Defendant S. Chin Kim referred herein to as Kim and Defendant Chun Rae Kim, a Samsun Defendant, who was dismissed from the action by Plaintiffs prior to trial.

from the action. On appeal, the defaults were reversed for Tong Soo Chung, DEO of Matinee East-Asia region, and S. Chin Kim, Vice President of Matinee. Both Defendants seek summary judgment on the merits of all the claims against them.

According to the Defendants, the Plaintiffs proceed against them on only two claims: civil conspiracy and for declaratory judgment to pierce the corporate veil under the alter ego doctrine. Plaintiffs have not, however, agreed to voluntarily dismiss the other claims. The six claims alleged in the Second Amended Complaint are: 1) breach of contract (Count One), unjust enrichment (Count Two), conspiracy (Count Three), fraudulent inducement (Count Four), conversion (Count Five), and alter ego/declaratory judgment (Count Six). Plaintiffs agree and decline briefing the other claims as being an unnecessary and irrelevant consumption of substantial portions of the Plaintiffs' dispositive motions. (Response to Chung (Doc. 477) at 5[2] n.1.)

Both Defendants paint themselves as being just like the Plaintiffs: victims of con-artist Defendant Jeoung's fraudulent scheme.

Defendant Chung asserts that after nearly six years of litigation, the Plaintiffs lack any evidence of any agreement for an unlawful purpose to support a conspiracy claim, which is barred by the intra-corporate conspiracy doctrine. He asserts that civil conspiracy is not an independently recognized cause of action under Arizona law, and there is no evidence of an underlying tort to support a derivative civil conspiracy claim. Defendant Chung argues that Plaintiffs lack any evidence to warrant piercing the corporate veil of Matinee by declaratory judgment to impose alter ego liability on him for the fraudulent acts of Defendants Matinee and/or Samsun.

Defendant Kim seeks summary judgment on the alter ego claim because he was not a shareholder in Matinee Energy and did not control or dominate Matinee Energy, therefore, it would be unjust to hold him liable under the alter ego doctrine

---

[2] Page citations are to CM/ECF, not the brief pagination.

for Matinee Energy's debts. Kim argues that he cannot be liable for conspiracy to commit fraud because he did not have any intent and did not agree to commit fraud, and none of the Plaintiffs detrimentally relied on any alleged representation by him. Kim asserts that the economic loss rule bars recovery in tort for purely economic loss, unless a construction contract otherwise provides, and there is no such provision in any contract, here. Kim disputes Plaintiffs' allegations that Matinee acted to defraud Plaintiffs.

Based on the defaults entered against corporate Defendant Matinee Energy and Jeoung for fraudulent misrepresentation, the Plaintiffs argue that Chung and Kim were members of the Matinee Project/Jeoung conspiracy because they acted in concert with these other admitted coconspirators. Plaintiffs assert that Defendants Chung and Kim knowingly and recklessly supported the Matinee Project by making fraudulent representations to potential construction contractors like the Plaintiffs, even after learning in 2010 that Matinee had no, or insubstantial assets, could not secure construction financing on its own to pay contractors, and could not implement the mega-billion-dollar construction project. Alternatively, Plaintiffs ask the Court to impose alter ego liability on Chung and Kim for the fraudulent acts of Matinee.

<u>Count IV: Fraudulent Inducement</u>

Plaintiffs do not press the fraudulent inducement claim directly against Defendants Chung and Kim but assert instead that Chung and Kim were coconspirators as alleged in the Second Amended Complaint (SAC).[3]

Plaintiff Hankook was introduced to the Matinee Project by a South Korean corporation, I1Yang, in February 2010, as being a three-state (California, Nevada, and Arizona), 5 billion-dollar, solar power project. To participate in the Matinee Project, Hankook acquired a 50% interest in I1Yang. Matinee, Jeoung, and the Samson Defendants, John Lee and Chun Rae Kim, demanded an advance payment

---

[3] SAC (Doc. 197).

of $500,000. When Hankook refused, a Hankook-Samsun partnership agreement was entered into whereby Hankook paid Samsun $500,000 for various Matinee Project related services. On July 30, 2010, Hankook entered into the Pre-Master Agreement with Matinee to be the turn-key contractor on the Benson, Matinee Project. (SAC ¶¶ 25-30.)

Hankook, previously K & Company, formed a consortium with a prominent South Korean company, LS Industrial Systems (LSIS) to proceed with the Matinee Project as the K&LSIS consortium. Hankook was repeatedly assured by Jeoung, the Samsun Defendants, and Matinee that J.P.Morgan financing was arranged and ready, but Matinee repeatedly refused to arrange a meeting for Hankook with J.P.Morgan. By the end of 2010, on December 15, 2010, Hankook met with Defendant Chung because of the repeated inability to secure a meeting through Matinee with J.P.Morgan. Chung allegedly told them that the project was proceeding as planned. Still without having arranged for Hankook to meet with J.P.Morgan, Matinee demanded that Hankook deposit capital into a joint venture company in the United States. Hankook refused. Matinee demanded Hankook lend it $2 million on the condition that Matinee would repay the loan from a future government solar subsidy. Hankook refused. Hankook did make a $9,000 personal loan to Jeound, which he promised to repay within two or three days and did not repay. Eventually, Hankook demanded that Matinee sign the final EPC (engineering/procurement/construction) agreement and proceed with the project. On June 23, 2011, Matinee terminated the Hankook agreement. (SAC ¶¶ 31-43.)

LSIS, then withdrew from the K&LSIS consortium and introduced Defendant Samsun to Plaintiff Jes Solar for Jes Solar to participate in the Matinee Project as the turn key contractor. (SAC ¶ 42.)

Jes Solar alleges it met the Samson Defendants and were told that Matinee had been established since 2006; Michael Pannos, Chairman of Matinee, was a prominent business figure in the United States; Defendant Kim was Vice Chairman

of Matinee in charge of the green-power management division; Matinee had already developed 15 initial solar plants in California and Arizona, and Matinee was developing $5 billion worth of solar projects in the United States, with financing from J.P. Morgan. Jes Solar alleges that Matinee Defendants, including Defendant Kim, represented that Matinee had invested in excess of $600 million in its solar projects and would benefit from $1.3 billion in government subsidy funding. Jes Solar alleges that based on these representations, it decided to enter into a partnership agreement with Samsun, whereby Samsun would assist Jes Solar with the Matinee Project for 1% of the total cost of construction. Jes Solar met with the Samsun Defendants and Jeoung on July 16, 2011 and wanted to delay signing the partnership agreement and paying the 1%, but the Samson Defendants, acting as agent for Matinee, refused and threatened to look elsewhere for a contractor and cut Jes Solar out of the deal. (SAC ¶¶ 43-50.)

Allegedly, Jeoung and the Samsun Defendants told Jes Solar that Matinee had already structured the construction financing, and the bank was ready to issue the LC. On July 16, 2011, allegedly, at the invitation of Defendant Kim, Jes Solar attended a meeting at his private residence and was informed that any advance payments made by Jes Solar would be secured by Kim personally. (SAC ¶ 54.) Kim confirmed the financing availability and that the LC was ready. *Id.* Jes Solar signed the partnership agreement at the July 16, 2011 meeting. (SAC ¶ 49.)

Jes Solar, however, refused to pay the 1% or an advance fee until Matinee provided a Letter of Credit (LC)[4] from J.P.Morgan to verify and provide assurance of financial stability for the joint business venture. (SAC ¶¶ 51-52 .)

The Master Agreement between Matinee and Jes Solar provided for a more detailed agreement to follow, the EPC. (SAC ¶55.) Jes Solar began preparation for

---

[4] Letters of Credit are especially useful in international trade because a LC issued to a Buyer, in this case Matinee, ensures it receives goods or services and ensures the Seller, in this case the EPCs, it will be paid. Both parties can move forward under a contract without worrying about whether they will receive goods paid for or worry about getting paid for services delivered.

the project by forming a consortium with Plaintiff Airpark the Jes Solar/Airpark consortium (the Consortium).  (SAC ¶ 56.)

August 22, 2011, Defendant Chun of Samsun formed an Arizona solar consulting company, J&A Solar, on behalf of the Consortium and opened a Wells Fargo bank account for the deposit of project funds in the United States.  (SAC ¶ 58.)

On October 28, 2011, a groundbreaking ceremony was held at the Benson, Arizona, project site, even though Matinee had not yet obtained the grading permits. Defendants Kim was present at the ceremony and made a great show of introducing Defendant Chung, who was well known and respected in S. Korea, and a former high-ranking officer of the International Trade Administration of the United States Department of Commerce.  At the groundbreaking ceremony, Defendant Kim demanded an additional $1 million advance payment from the Consortium and agreed that when the $1 million was paid, the LC would be issued.  (SAC ¶ 62-68.)

On October 27, 2011, the Consortium entered into the EPC Agreement. (SAC ¶ 69.)

On November 1, 2011, the Consortium transferred $1 million to the J&A Solar Wells Fargo trust account, to be paid as follows: $200,000 to Samsun; $130,000 to NewTech, and $670,000 to remain in the account for the construction project.  The $670,000 was, however, transferred to Matinee.  (SAC ¶ 70.)

Allegedly, pursuant to demands from Jeoung and Kim, the Consortium made a $250,000 payment to Defendant Samsun on August 17, 2011; on September 19, 2011, Jes Solar paid Samsun $350,000, and on September 19, 2011, Jes Solar paid $60,000 to New EnerTech Co, a South Korean Corporation, designated by Samsun for payment as its subcontractor.  (SAC ¶ 57.)

On November 4, 2011, Kim forwarded the Consortium "Memorandum One," the agreement which would open the LC in the amount of $16 million during the week of November 6-12, 2011. When the LC was not issued, the Consortium to

begin looking into matters and discovered newspaper articles and other damning information regarding Matinee's Chairman Michael Pannos. (SAC ¶¶ 70-77.) As part of its investigation, the Consortium contacted Defendant Chung, and he advised "the delay by J.P.Morgan Chase might be caused by the Patriot Act." (SAC ¶ 78.)

On December 9, 2011, the Consortium contacted J.P.Morgan directly regarding the issuance of the LC and were told that Matinee had failed to provide its assets as collateral, which was required by J.P. Morgan to issue the LC. (SAC ¶ 76.)

On December 20, 2011, the Consortium asked for the return of the $1.6 million, which was not forthcoming. (SAC ¶ 81.)

<u>Standard of Review for Summary Judgment</u>

On summary judgment, the moving party is entitled to judgment as a matter of law if the Court determines that in the record before it there exists "no genuine issue as to material fact." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact but is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986). In determining whether to grant summary judgment, the Court views the facts and inferences from these facts in the light most favorable to the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp*., 475 U.S. 574, 577 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). A material fact is any factual dispute that might affect the outcome of the case under the governing substantive law. *Id.* at 248. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the non-moving party. *Id*.

The moving party is under no obligation to negate or disprove matters on which the non-moving party bears the burden of proof at trial. *Id.* at 325. Rather, the moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case. *Id.* If the moving party meets its burden, it then shifts to the non-moving party to 'designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed.R.Civ.P. 56(e)). To carry this burden, the party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers. *Anderson*, 477 U.S. at 252. The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

This trilogy of 1986 cases opened the door for district courts to rely on summary judgment to weed out frivolous lawsuits and avoid wasteful trials. *Rand v. Rowland*, 154 F.3d 952, 956-957 (9th Cir. 1998); 10A Charles A Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2727, at 468 (1998). As explained in *Celotex*: "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The Judge's role on a motion for summary judgment is not to determine the truth of the matter or to weigh the evidence, or determine credibility, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252.

Defendants' Motion for Summary Judgment: Conspiracy and Alter-Ego Claims

Defendant Jeoung was considered the head of operations for the Defendant Matinee Energy's multi-billion-dollar solar power plant construction project, the Matinee Project.

(Chung SOF[5] ¶ 69.)   It is undisputed that Jeoung, alias Sung Ho Byun, has been apprehended by law enforcement and is in federal custody pending trial on criminal charges, including wire fraud.  He is a con-artist from Korea, who was caught in Korea in 1997, escaped, and fled to the United States where he has been a fugitive for about 21 years.  Allegedly, he committed similar acts to those alleged, here, in California from 2006 to 2008.

In 2007, Defendant Kim was introduced to Jeoung by Mr. Kim's pastor. (Kim SOF[6] ¶ 23.)  Kim believed the Matinee Project was a legitimate venture and that Jeoung was a legitimate businessman.  (Chung SOF ¶ 22-25.)

In January 2010, Jeoung engaged J.P.Morgan Securities, Inc. (JPM Securities) to provide $4.9 billion in financing for the Matinee Project.  (Kim SOF ¶¶ 26-28.)  Kim was personally present at conferences in the J.P.Morgan Executive Board Room at JPM Securities headquarters where J.P.Morgan Securities was represented by Managing Directors, Executive Vice Presidents, Vice Presidents, and the Chief Risk Officer and where J.P.Morgan Securities representatives spoke of $450 million to $600 million of financing for specific proposed contractors, and Kim saw draft term sheets from J.P.Morgan Securities for $100 million to $300 million facility loans.  (Kim SOF ¶¶ 29-39.)  The J.P.Morgan Securities' financial participation was a highly valued mark of credibility, especially to Kim, who had worked a long time on Wall Street and knew J.P.Morgan Securities' reputation for being very exclusive in its dealings.  (Kim SOF ¶ 40.) Shortly thereafter, at Jeoung's invitation, Kim agreed to be the Vice Chairman and Strategic Adviser of Matinee Energy, and in September 2010, Kim became the CEO. (Chung SOF ¶ 9.) Kim believed Jeoung's representation that he had a billionaire investor in Matinee that had invested $582.5 million.  (Kim SOF ¶ 24.)

In February 2010, Defendant Chung was in New York to give a speech to the Korea Society on behalf of Invest Korea. He had not seen Kim for a few years and invited him to

---

[5] Chung SOF (Doc. 470).
[6] Kim SOF (Doc. 476).

- 9 -

attend the speech. (Chung SOF ¶ 10-11.) Kim told Chung about his new venture with Matinee Energy and that it had great potential. (Chung SOF ¶¶ 12-13.)

In May 2010, after Defendant Chung began working full-time at Yulchon, an international corporate law firm headquartered in Seoul, South Korea, (SOF ¶ 14), he agreed to help Kim by introducing Matinee Energy to large Korean companies, such as Hyundai Heavy Industries Co., Ltd. and LG Electronics Inc., which could potentially be suppliers or contractors for the Matinee Project. (Chung SOF ¶ 15.)

Chung was not involved in any contract negotiations between Matinee Energy and these companies. (Chung SOF ¶ 16.) He was given the title of CEO of Asia Pacific Matinee Energy, alternatively referred to as the Asia Pacific Rim Division, (Chung SOF ¶ 17); neither one being a separately incorporated legal entity or formal subsidiary of Matinee Energy. (Chung SOF ¶ 18.) Defendant Chung was not an owner or shareholder of Matinee Energy and never received a salary or any other compensation, (Chung SOF ¶¶ 19 and 23), except Matinee Energy paid for his hotel during the groundbreaking ceremony in Benson, Arizona, on or about October 27, 2011, (Chung SOF ¶ 23).

At all relevant times, Defendant Chung lived and worked in Seoul, South Korea. (Chung SOF ¶ 20.) Matinee Energy was based in Nevada and Arizona. (Chung SOF ¶ 21.) Chung relied on Kim for updates on the Matinee Project. (Chung SOF ¶ 22.)

Kim was a victim of Matinee Energy and Jeoung. (Kim SOF ¶¶ 21, 42-47.) Kim, himself borrowed $250,000 to loan to Matinee, based on the representations of Jeoung, and was only able to repay the loan that he had gotten by selling his own home. (Kim SOF ¶¶ 42-43.) Kim loaned an additional $145,000 to Matinee and advanced costs of $78,000 based on representations from Jeoung. (Kim SOF ¶¶ 42-43, 45.) Of the total amount loaned to Matinee and advanced costs for Matinee, $303,000 still is unrepaid. (Kim SOF ¶¶ 44-45.) Although he was promised stock in Matinee and kept asking for Matinee stock to be issued to him, Kim was never given any stock in Matinee. (Kim SOF ¶¶ 4-5.)

While Kim held the title as Matinee's Vice President and CEO, he had little power; he did not control or dominate Matinee Energy or the Matinee Project. (Kim SOF ¶¶ 6-

21.) Plaintiff Jes Solar admitted knowing that Jeoung, as the President, was the brains of the Matinee operation, and Matinee's operations were governed by the business plan developed by Jeoung. (Kim SOF ¶¶ 75, 76.)

Matinee's Board of Directors, accounting books and records, and access to bank accounts were controlled by Jeoung. (Kim SOF ¶ 12.) Kim had no authority to withdraw any sums of money from any Matinee bank accounts and was not even informed as to the locations of all of Matinee's bank accounts. (Kim SOF ¶¶ 6-7.) Kim did not know that Jeoung was depositing money taken from Matinee into as many as 88 bank accounts. (Kim SOF ¶ 7.) In short, all the financial and legal decisions were controlled by Jeoung, and he negotiated the terms of Matinee's agreements, unilaterally, only consulting with Kim on brief occasions. (Kim SOF ¶¶ 13-20.)

Defendant Chung does not dispute for purposes of the Motion for Summary Judgment, Hankook's allegation in their Complaint that on December 15, 2010, executives of Hankook met Chung at Yulchon's office in South Korea, and Mr. Chung "confirmed that the Matinee Project was proceeding as planned." (Chung SOF ¶ 52.) However, the only disclosed witness by Hankook, Bong Ki Lee, former chief financial officer for Hankook, testified at the damage trial that Hankook was introduced to the Matinee Project by a company called I1 Yang in 2010, (Chung SOF ¶ 48), and formed a consortium with I1 Yang and others in 2010, (Chung SOF ¶ 50). Hankook and its Consortium entered into a Pre-Master Agreement with Matinee on July 30, 2010." (MSJ (469) at 4) (citing (Chung SOF ¶¶ 49-50) (noting at the time, Plaintiff Hankook was called K & Company Ltd.)).

Mr. Chung attests that he did not introduce any of the Plaintiffs to Matinee; he had no interaction, either in person, by phone, or by email, with Plaintiffs Hankook, Jes Solar, and Airpark which could have induced them to enter into contracts with Matinee Energy. Both Plaintiffs Hankook and Jes Solar attested that they did not meet Defendant Chung until the 2015 damage trial held in this case. (Chung SOF ¶¶ 59, 66-67.) Jes Solar introduced Airpark to Matinee Energy. (Chung SOF ¶ 63.) "Plaintiff Airpark met Chung

in person at the groundbreaking ceremony in Benson, Arizona, in October 2011." (Chung SOF ¶ 67.)

"Jes Solar entered into a "Partnership Agreement for Construction of a Photovoltaic Power Plant" with Defendant Samsun LLC on July 16, 2011. (MSJ (Doc. 469) at 4-5 (citing (Chung SOF ¶ 57)). "Jes Solar entered into a Master Agreement with Matinee on July 14, 2011." *Id.* at 5 (citing (Chung SOF ¶ 58)).

Airpark and Jes Solar entered into a "Joint Solar Plant Project Agreement: Joint Project Agreement on Matinee Solar Plant Construction" on August 12, 2011. (Chung SOF ¶ 64.) Airpark entered into the EPC Contract with Matinee Energy and the Jes Solar/Airpark Consortium, dated October 27, 2011. (Chung SOF ¶ 65.)

Kim continued to believe in the validity of the Matinee Project until March 2013, when Jeoung obstructed Kim from investigating fraud allegations against Matinee. (Kim SOF 22.) From late 2011 through the summer of 2012, Defendant Chung received periodic email updates from Defendant Kim, (Chung SOF ¶ 24), which led Chung to understand that the Matinee Project was moving forward, (Chung SOF ¶ 25). On "September 1, 2012, Mr. Chung received an email alerting him to the complaint filed by Jes Solar. (Chung SOF ¶ 26.)

<u>Plaintiffs' Response to Defendants' Motions for Summary Judgment</u>

To survive summary judgment, the Plaintiffs must do more than designate specific facts showing that there is a genuine issue for trial; they may not rely upon mere allegations or denials in the pleadings or papers. The Plaintiffs must do more than simply show that there is some metaphysical doubt as to the material facts, and the mere existence of a scintilla of evidence is insufficient; there must be evidence on which the jury could reasonbly find for the [Plaintiffs]. *Matsushita,* 475 U.S. at 586; *Anderson,* 477 U.S. at 252.

The question on summary judgment is whether Plaintiffs present evidence supporting specific factual allegations from which a reasonable jury could find in favor of the Plaintiffs at trial on the conspiracy and alter-ego claims.

Plaintiffs argue that the underlying tort claim of fraudulent inducement by misrepresentation has been established, pursuant to the allegation in the SAC and entries of default against Jeoung and Matinee Energy. According to the Plaintiffs, as for both Chung and Kim, the issues that remain are: 1) whether Chung/Kim conspired with Jeoung and/or Matinee, and 2) whether Chung/Kim controlled Matinee Energy, a sham corporation, establishing alter-ego liability against them for Matinee's role as a coconspirator in the fraudulent inducement conspiracy.

By Defendants' own admissions, Plaintiffs have established that Jeoung was engaged in improper fraudulent activities, including fraudulent inducement and embezzlement of advance payments made by Plaintiffs to secure construction contracts for the Matinee Project. Defendants, however, dispute whether Matinee Energy was a member of this alleged fraudulent conspiracy perpetuated by Jeoung or a victim, like Plaintiffs. (Chung Reply (Doc. 483) at 10.) Defendants Chung and Kim argue that the Plaintiffs may not rely on the default of liability against Matinee to establish that as a matter of fact Matinee was a coconspirator with Jeoung for purposes of imposing liability on them. (Chung Motion (Doc. 469) at 17 (citing *Clugston v. Moore*, 655 P.2d 29, 31–32 (Ariz. App. 1982) "[A] default entered against one defendant d[oes] not prevent the other defendants from litigating the matters admitted by the defaulting defendant.")

The Plaintiffs counter that *Clugston* involved the question of "'what the effect of [the defaulted defendant]'s admissions, implied from the default, are upon [the defendant] who had not defaulted and who had *expressly denied and placed in issue the truth of the allegations deemed admitted by the defaulting party.*'" (Response (Doc. 477) at 8 (quoting *Clugston*, 134 Ariz. At 207) (emphasis added in Response). Plaintiffs argue that *Clugston* does not apply because, here, the defendants, who are no longer in default, Chung and Kim, "[have] not 'expressly denied and placed in issue the truth of the allegations deemed admitted by 'the defaulted defendants, [Jeoung and Matinee Energy,] in this action with respect to Plaintiffs' fraud claim." *Id.* As noted above, Chung and Kim do expressly deny and place in issue the truth of the allegations deemed admitted by

the defaulted Defendant Matinee; both have answered and denied being coconspirators in the alleged fraudulent inducement scheme, denied knowingly making fraudulent misrepresentations, and both denied Matinee served as their alter egos. (Kim Answer (Doc. 431) ¶¶ 102-122, 129-132); (Chung Answer (Doc. 433) ¶¶ 102-122, 129-132).

First, the Court finds that Defendants correctly rely on *Clugston*. Plaintiffs also underassess the breadth of the remand. The defaults, including any alter-ego admissions, by Chung and Kim have been reversed and remanded for resolution on the merits. The Court will not reestablish alter ego liability for Kim and Chung by default again— through such admission by the entry of default against Matinee. Instead, the Court begins with the fact, not argued on summary judgment, that Plaintiffs were fraudulently induced into making advance payments. Neither party addresses whether Matinee was the alter ego of Jeoung, a relationship critical to the assertions that Jeoung victimized them through his control of Matinee and the Matinee Project. The Court presumes for purposes of summary judgment that Matinee was the alter ego of Jeoung because Jeoung controlled the money flowing into Matinee for the Matinee Project and used it for his own personal interests.

There are two paths to success for Plaintiffs, if they can establish Chung and Kim: 1) were members of the conspiracy to fraudulently induce advance payments from Plaintiffs to Matinee, or 2) Matinee was the alter ego of Chung and Kim, and Matinee fraudulently induced Plaintiffs to advance it money for the benefit of Chung and Kim. As explained below, under the alter ego doctrine, the Plaintiffs must establish that there is no individuality or separateness between Chung and Matinee and/or Kim and Matinee such that Matinee the corporation ceased to exist, and within the context of these relationships, there must be evidence of fraudulent conduct.

Alter Ego

As a general rule, a corporation will be treated as a legal entity until sufficient reason appears to disregard the corporate form. *Dietel v. Day*, 492 P.2d 455, 457 (Ariz.App.1972). In general, this treatment of a corporation as a separate entity means

that the personal assets of a corporate officer may not be reached to satisfy corporate liabilities. *Loiselle v. Cosas Mgmt. Group*, *LLC*, 228 P.3d 943, 950 (Ariz.App.2010) . "But courts will disregard the corporate entity and pierce the corporate veil if there is sufficient evidence that: 1) the corporation is actually the alter ego of one or a few individuals and 2) observance of the corporate's separate legal status would sanction a fraud or promote injustice." *Five Points Hotel Partnership v. Pinsonneault,* 835 F. Supp.2d 753, 759 (Ariz. 2011) (citing *Employer's Liab. Assurance Corp. v. Lunt*, 313 P.2d 393, 395 (1957)). "'The disregard of the corporate fiction has not been [limited] to instances where the incorporation is for fraudulent purposes but may be observed if after organization the corporation is employed for fraudulent purposes.'" *Id*. at 396.

"The alter ego status is said to exist when there is such unity of interest and ownership that the separate personalities of the corporation and owners cease to exist." *Dietel,* 492 P.2d at 457 (citations omitted). "If there is no unification of interests and intermingling of funds, so that the corporation loses its separate identity, then the owners should not be personally liable." *Id.* (citations omitted). Arizona courts consider various factors when determining whether unity of interest and ownership exists under the alter ego doctrine, such as commingling of personal and corporate funds and assets, failure to keep funds from various entities separate, and unauthorized diversion of corporate funds or assets for non-corporate purposes. *Ize Nantan Bagowa, Ltd. v. Scalia*, 577 P.2d 725, 729 n. 4 (Ariz.App.1978), *see also, Great Am. Duck Races, Inc. v. Intellectual Solutions, Inc.*, 2013 WL 1092990 *7 (D. Ariz. Mar. 15, 2013) (citing *Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195 (Ariz. 1994) (assessing unity of control by considering: "payment of salaries and expenses of the corporation by shareholders; failure to maintain corporate formalities; undercapitalization; commingling of corporate and personal finances; plaintiff's lack of knowledge about a separate corporate existence; owners' making of interest-free loans to the corporation, and diversion of corporate property for personal use."))

In other words, courts may pierce the corporate veil if the two, the defendant and the corporate entity, are inseparable from one another due to the degree of interest and ownership, and there is evidence of fraud. *Chapman v. Field*, 602 P.2d 481, 484 (Ariz. 1979); *In re Sanner,* 218 B.R. 941, 947 (Bankr. Ariz. 1998) (agreeing Arizona law is well established).

A plaintiff alleging alter ego liability "must do more than make conclusory statements regarding an alter ego relationship between individual and corporate defendants; the plaintiff must allege specific facts supporting application of the alter ego doctrine." *Barba v. Lee*, 2009 WL 8747368 * 31 (D. Ariz. Nov. 4, 2009). Isolated occurrences of some relevant factors are not enough to establish alter ego liability. *Cornelis v. B&J Smith Associates LLC*, No., 2014 WL 1828891 * 26 (May 8, 2014).

The evidence has to show that the corporation was not only influenced and governed by a defendant, but that there was also such a unity of interest and ownership that the individuality or separateness of the defendant and the corporation had ceased to exist. *Dietel,* 492 P.2d at 458 (citing *Whipple v. Industrial Commission*, 121 P.2d 876, 209 (Ariz. 1942), *Home Builders & Suppliers v. Timberman*, 256 P.2d 716 (1953)). The evidence has to show that observance of the corporate form would sanction a fraud. *Id.* (citing *Timberman,* 256 P.2d at 345, *Phoenix Safety Investment Co. v. James,* 237 P. 958 (1925)). It is not enough that plaintiffs did not receive the benefit of their bargain, that alone does not constitute any evidence of fraudulent conduct and is not sufficient to justify disregarding the corporate entity. *Ferrarell v. Robinson,* 465 P.2d 610, 613 (Ariz. 1970).

Arizona does not recognize piercing the corporate veil or alter ego as an independent cause of action. *Five Points Hotel Partnership v. Pinsonneault*, 835 F. Supp.2d at 759. But, Plaintiffs may seek derivative liability under an alter ego theory against Kim and Chung, if Plaintiffs can "prove both (1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice." *Gatecliff*

*v. Great Republic Life Insur.*, 821 P.2d 725, 728 (Ariz. 1991) (citing *Dietel v. Day*, 492 P.2d 455, 457 (Ariz. App. 1972)).

<u>Conspiracy</u>

First, the Court considers whether Plaintiffs present evidence sufficient to show that Defendants Kim and Chung were coconspirators in the alleged conspiracy to fraudulently induce the Plaintiffs to make advance payments to Matinee and/or the Matinee Project.

Under Arizona law, a civil conspiracy claim requires an agreement. *Rowland v. Union Hills Country Club,* 757 P.2d 301, 305 (9th Cir. 1988). The Plaintiffs must show by clear and convincing evidence as to each defendant, Chung and Kim, and at least one other person that an agreement existed to accomplish an unlawful purpose or lawful purpose by unlawful means, and the accomplishment of the underlying tort, which in turn caused damages. *Dawson v. Withycombe*, 163 P.3d 1034, 1053 (Ariz. Ct. App. 2007).

In Arizona, there is a high evidentiary bar to prove an agreement for a conspiracy claim. It may not be enough to simply show a defendant assisted the tortfeasor because there is a qualitative difference between showing an agreement to participate in a tort, which is a conspiracy, and knowingly aiding and abetting a tortious act. *Id.* 163 P.3d at 1053–55. Either way, there must be evidence of scienter, meaning that the defendant knew he was agreeing to commit a tort or knew the conduct he aided and abetted was a tort. *Id.* [7]

This does not mean that the conspiratorial agreement must be express; it may be implied by the tortious conduct itself. *Id.* at 1054 (citing Restatement (Second) of Torts § 876 cmt. a (1979)). A conspiracy may be established by circumstantial evidence through

---

[7] *Compare Aetnea Cas. And Sur. Co. v. Leahey Construction Co.*, 219 F.3d 519, 526-27, 537 (9th Cir. 2000) (evidence that a bank knew borrower was engaging in tortious conduct by inflating its net worth through short term (four-day) loan to meet capitalization requirement for surety bonds then withdrawn several days later, while sufficient to prove aiding and abetting in a fraud, was insufficient to meet the higher standard of an agreement to participate in the fraud). Evidence of negligence is not enough. *Id.* at 536. Aiding and abetting focuses on whether a defendant knowingly gave substantial assistance to someone who performed wrongful conduct; conspiracy focuses on whether the defendant agreed to join in the wrongful conduct. *Id.* at 538-39.

the nature of the acts, the relationship of the parties, the interests of the conspirators, or other circumstances." *Id.* (citing *Mohave Elec. Coop., Inc. v. Byers*, 942 P.2d 451, 465 (Ariz. App.1997)).  Circumstantial evidence may create an inference of an actual agreement to participate in the tortious conduct, with the inference being "based in part on the relationships between the actors and the actions (the proximity in time and place of the acts and the duration of the actor's joint activity)."  *Id.*

In other words, mere suspicious cooperative activity between alleged conspirators may not amount to clear and convincing evidence of an actual agreement to participate in the tortious conduct. Clear and convincing evidence may be circumstantial and established by inference, but the evidence must create a high probability or reasonable certainty that Defendants actually agreed to participate in the alleged fraudulent conspiracy, i.e., they agree to fraudulently induce advance payments from the Plaintiffs. *Id.* (citing *Kent K. v. Bobby M*., 110 P.3d 1013, 1018-19 (Ariz. 2005).

In *Wells Fargo Bank v. Arizona Laborers, Teamsters, Local 395 Pension Fund*, 38 P.3d 12, 37 (Ariz. 2002) (en banc), wherein mere suspicious cooperative activity between the alleged conspirators was found to not amount to clear and convincing evidence of an actual agreement to participate in the tortious conduct.  In *Wells Fargo*, the bank and the tortfeasor's agents had discussed a potential foreclosure,  and, thereafter, the tortfeasor presented an inflated asset statement which was considered in combination with the bank's interest in painting a rosy picture of the tortfeasor's financial situation to permit a replacement loan by trust funds, -- and was found to be insufficient as a matter of law to prove the bank conspired with the tortfeasor.  *Id.* at 17–20, 37.

In *Dawson*, the Plaintiff Dawson argued that the jury could have inferred an agreement between Withycombe and Goett to obtain a loan from Dawson by fraud based on the following: 1) a meeting between the two, in which Withycombe obtained an agreement to be released from a $7 million guaranty if Dawson invested in Futech, the company; 2) Withycombe's subsequent meeting with Dawson in which he made positive comments about Futech; 3) Withycombe's vote authorizing Goett to obtain the loan from

Dawson, and 4) evidence that Withycombe was aware Goett had a history of misrepresenting facts to obtain financing for Futech. The court held that Dawson's reliance on events leading to the procurement of the loan fell short of the clear and convincing evidence needed to prove that Withycombe reached an actual agreement with Goett to defraud Dawson in relation to Dawson's loan of money to Futech.

The court rejected Dawson's characterization of Withycombe and Goett's agreement to absolve Withycombe from liability for his previous $7 million guaranty and instead found it was only a release from liability on Withycombe's guaranty, and not that the original $7 million loan would be satisfied by the funds from the new Dawson loan. Further, there was no evidence, circumstantial or otherwise, to connect the agreement to release Withycombe's guarantee with the procurement of the loan from Dawson. The court considered evidence that Withycombe had lunch with Dawson shortly after the Withycombe-Goett meeting, but found that the lunch was at Dawson's invitation, and Withycombe's comments about Futech were in response to Dawson's questions. The court rejected reliance on Withycombe's vote authorizing Goett to obtain the loan from Dawson as a conspiratorial agreement because Wythycombe and Goett's votes could easily have been overridden by the other Board members. And, regardless of the ultimate result of the votes, rather than Withycombe's vote being part of a conspiracy with Goett, he may have just been fulfilling his duty as a director to seek an infusion of short-term capital.

Notably, the court found the underlying assumption that would connect the above events as circumstantial evidence of a conspiracy was Withycombe's purported knowledge that Goett had procured financing from him by dishonest means and that Goett was negotiating more financing from Dawson. Dawson contended this was evidence of Withycombe's agreement that Goett should procure further funding by fraudulent means. There was some evidence to imply that Withycombe believed Goett had misled him, Withycombe, to obtain financing from him. The court, however, concluded that like *Wells Fargo*, such knowledge is insufficient to prove an actual

agreement by clear and convincing evidence because the heightened standard of proof requires the fact of a conspiratorial agreement to be indicated by the evidence to a highly probability or reasonably certain. The court held that the issue should not have been presented to the jury.

This Court turns to the facts and evidence submitted by the Plaintiffs in response to the Defendants' dispositive motions.

<u>Plaintiffs' Statement of Facts and Evidence Supporting Claims Against Defendants</u>

Plaintiffs dispute Kim's assertion that he believed, and had substantial reason to believe, the validity of the Matinee Project until March 2013, when Jeoung obstructed him from investigating the fraud allegations made against Matinee. Plaintiffs assert that Kim knew in 2010 that Matinee had no assets or financial backing by a billionaire investor and knew Matinee was not capable of either securing construction financing on its own to pay contractors or of implementing the mega-billion-dollar Matinee construction project.

Plaintiffs submit that Kim made fraudulent representations from the inception of his involvement with the Matinee Project, such as saying that "the JP Morgan project money was ready to be used, and that since 2001, Matinee had equity of USD 600 million for developing the project over 4 years." (Response (479) at 10-11 (citing (P SSOF[8] ¶¶ 6-9, 16, 30, 33, 37-39, and 41).

According to the Plaintiffs, minutes from a meeting held in New York on March, 11, 2010, attached to an email from Kim to Chung dated March 18, 2010, reflect that employees of Samil PricewaterhouseCoopers (Samil PwC) inquired about the role of J.P.Morgan, and they, referring to attendees Kim and Jeoung, responded that "the project money is ready to be used...In general, a financing structure allocates 20% - 30% of the host company to equity and a port (sic) of the remainder to senior debts and other subordinated debts...Since 2001, Matinee has equity of USD 600 million for developing this project over 4 years"). (P SSOF ¶16.) According to the minutes, it was generally

---

[8] Plaintiffs Separate Supplemental Statement of Facts (Doc. 480).

known by the participants that since the financial crisis, it was difficult to provide credit to Korean contractors and that Korean contractors tended to not participate in equity investments but would be appointed as sub-contractors. *Id.*

The Plaintiffs' misrepresent the evidentiary value of the minute entry. While the assertions of its content are accurate, the minute entry attributes them to being made by Matinee, not Kim. *See* (Ps SSOF, Ex. C (Doc. 478-2) at 18-20): SAMIL 3/11/2010 Meeting Minutes.) The Plaintiffs are correct that the minutes serve to establish what both Kim and Chung knew because it was emailed from Kim to Chung. Both knew there was allegedly $600 million in equity available in Matinee for developing this project over 4 years. The minutes do not establish that Kim or Chung new this was a false representation. The Court also notes, the minutes contain a disclaimer: "No representation or warranty, expressed or implied, is made by Samil PwC as to the accuracy, reliability or completeness of any of the information contained herein." *Id.* at 17. The Court notes that the minutes reflect that Samil PwC informed Matinee, including Kim, that its equity investment strategy would be more difficult to implement using Korean ECPs versus Chinese ECPs. The Plaintiffs do not explain how Kim's knowledge of either of these alleged facts supports the conspiracy or alter ego claim.

Plaintiffs challenge Kim's assertion that he believed there was a billionaire investor and/or Lucas Investment Corporation backing Matinee and the Matinee Project because "[a]t all times relevant to this action, neither Choi nor Young Joon Hong ("Hong"), CEO of Airpark heard from Mr. Kim, Mr. Chung, Paul Jeoung, Jeong Dong Song, or anyone about the financial backing of a billionaire investor in Boston or Lucas Investment Corporation for the Matinee Project or Matinee." (Response (479) at 12 (P SSOF ¶ 41.) The Court will not balance the weight of the evidence on summary judgment, but what Airpark was <u>not</u> told by Kim, Chung or Jeoung has de minimus, if any, evidentiary relevancy to establish what Kim knew.

Plaintiffs allege that from the 2010 inception of Kim's participation in Matinee, he knew Jeoung's representation that J.P.Morgan financing for the Matinee Project was

ready was false. According to the Plaintiffs, the documents speak for themselves: 1) the January 15, 2010, J.P.Morgan engagement letter stated that "[Matinee] acknowledges and agrees that J.P.Morgan's engagement hereunder is not an agreement by J.P.Morgan or any of its affiliates to underwrite, place or purchase any securities or otherwise provide any financing or ancillary financial services" (P SSOF ¶ 6); the November 19, 2010, draft term sheet for KEPCO KDN for a $300 million facility loan, issued by J.P.Morgan Securities to Matinee, the developer of the Benson Project, "propose[d] a security structure in which bank loans would be made to a Matinee Project entity, [KEPCO KDN], secured by the Benson Project and additionally guaranteed by KDN and [KEPCO]" (P SSOF ¶ 8); and the November 19, 2010, draft term sheet for LSI Systems for a $100 million facility loan issued by J.P.Morgan to Matinee, the developer of the Benson Project, proposed the same "security structure in which bank loans would be made to a Matinee Project entity, secured by the Projects and additionally guaranteed by [LSIS]." (P SSOF ¶ 9.)  The Court agrees that the documents speak for themselves.

The language from the January 15, 2010, J.P.Morgan letter of engagement pertains to J.P.Morgan's role as an underwriter of $2.5 billion of debt securities from various offerings, not the Letters of Credit (LC) at issue in this case, which Matinee failed to obtain to ensure payment to the Plaintiffs.  The letter of engagement is a letter agreement setting out the terms agreed to by the parties for J.P.Morgan to "act as sole underwriter and/or sole placement agent for a number of Offering[s]" "in connection with a three-phase $4.9 billion financing program, including the proposed issuance, offering and sale by the Company in a public or private offering (the Offering) of a number of financings, aggregating approximately $2.5 billion of debt securities (the Securities)."  (Kim Decl. Ex. H (Doc. 475-1) at 35.)  As recognized by the Plaintiffs, the language reflects a letter agreement, i.e., letter of intent, not the actual underwriting agreement which would be expected to follow if all parties agreed to these terms.  This document, assuming Kim saw it, shows that as of January 15, 2010, Kim knew of J.P.Morgan's intent to serve as the underwriter for a $4.9 billion financing program for Matinee, pursuant to terms which

Kim understood to be acceptable to Matinee.  The Court notes that the Letter Agreement and KEPCO KDN and LSI term sheets reflect the financing structure described in the Samil PwC minutes from the March 11, 2010, meeting.

Plaintiffs ignore that the draft term agreements for KEPCO KDN and LSIS contradict the assertion that Kim knew the J.P.Morgan financing was NOT ready for use. (KEPCO KDN (Doc. 475-1) at 41; LSIS (Doc. 475-1) at 44.) Both term sheets reflect that J.P.Morgan would make bank loans to the Matinee Project, secured by the Benson Project and guaranteed by KDN/KEPCO and LSIS, respectively.  The Court does not agree with Plaintiffs' assertion that the structure of the million-dollar J.P.Morgan facility loans reflected in these term sheets indicated that Matinee had no equity capital for J.P.Morgan to take as collateral and thus, all business risks were being passed on to construction contractors.   This argument ignores the intent to secure financing in part with the Benson Project reflected in both the term sheets and Samil PwC minutes. The fact that Plaintiffs were not told about a billionaire investor, simply, does not go to show Kim knew Matinee had no equity, did not believe a billionaire investor existed, and was incapable of securing construction financing on its own to pay contractors or of implementing the mega-billion-dollar Matinee construction project. The documents relied on by Plaintiffs reflect a shared-risk funding structure, with both Matinee and the contractors putting equity into the project.

According to Kim, he believed the financing structure for the EPC contractors should require them to make a cash commitment to the project.  (Kim Decl. (Doc. 475) ¶¶ 9-11.)  According to Kim, Jeoung changed the terms of the Jes Solar/Airpark Consortium's contracts from when the Master Agreement, July 16, 2011 and the EPC, October 27, 2011, were signed and when the Memorandum One was signed on November 4, 2011.  Initially and in the EPC, the Consortium was supposed to make an advancement of 1%, as an equity payment, but in the end Jeoung verbally agreed and electronically signed Kim's name to Memorandum One, before submitting it to Kim for approval, which included the provision for Matinee to provide a $16 million LC and

allowed the Consortium to use $8 million for its equity contribution to Matinee. (Kim Decl. (Doc. 475) ¶¶ 9-11; Master Agreement (Doc. 475-1) at 59; EPC (Doc. 457-1) at 68; Memorandum One (Doc. 475-1) at 76.) According to Kim, he was surprised and dismayed by the change in the funding structure for the Consortium. (Kim Decl. (Doc. 475) ¶9-11.)

According to the Plaintiffs, Kim could and should have checked out the falsity of J.P.Morgan financing for himself by directly contacting J.P.Morgan Securities. (P SSOF ¶ 7.) Plaintiffs suggest that if he had asked, he would have been told no and that a minimal amount of due diligence would have discovered the truth. Plaintiff rely on a news article published by Phoenix New Times dated April 12, 2012, which, in relevant part, informed: "Not true, says J.P.Morgan. The venerable U.S. securities firm tells, 'J.P. Morgan neither provided financing nor committed to provide financing to Matinee Energy and have no plans to finance the company in the future.'" Whether to prove the truth of the matter, this news article has no evidentiary value in relation to what Kim knew or should have known in 2010 or 2011. Plaintiffs were equally positioned to discover information contained in this article. Neither negligence nor "should have known" is the standard for establishing a conspiracy, and notably-- the news article is not true given the evidence in the record that J.P.Morgan issued a letter of intent to provide financing to Matinee Energy.

Plaintiff Hankook did contact J.P.Morgan directly regarding financing and discovered that it was not ready because Matinee had not produced the collateral necessary to secure the financing, which prompted Hankook to grow suspicious and eventually brought an end to their involvement with Matinee. Nothing precluded the other Plaintiffs or Kim and Chung from contacting J.P.Morgan directly, and this failure does not establish that Kim, any more than Plaintiffs, should have known that Matinee's assertions that J.P.Morgan financing was ready was false.

Plaintiffs complain that despite knowing the falsity of the J.P.Morgan project financing, Kim continued to represent to Plaintiffs that J.P.Morgan project financing was

ready, with LCs ready to be issued to construction contractors such as Plaintiffs. (P SSOF ¶¶ 30, 37-39). It is undisputed that Kim did repeatedly make such assertions. *See e.g.,* (Response (479) at 9 (citing SSOF ¶ 2: 11/5/2011 Email requesting approval, and Kim's immediate approval of "Memorandum One," wherein he committed Matinee to arrange the LCs in the total amount of $66 million to issue in favor of the JES Solar/Airpark Consortium). Plaintiffs, however, ignore that the falsity of Kim's repeated assertions regarding J.P.Morgan financing, including LCs being ready for issuance and use, is only incriminating if Kim knew them to be false. Like *Dawson,* the underlying assumption that would connect the above events as circumstantial evidence of a conspiracy is the Defendant's purported knowledge of the alleged tortious conduct, i.e., the false representations. Like *Dawson,* such evidence is lacking. *See supra* at 18-19.

Most importantly, Plaintiffs do not proffer any evidence to support the claim that Kim made the allegedly false representations in agreement with Jeoung and/or Matinee to secure advance payments from Plaintiffs for an unlawful purpose, not for the construction of the Matinee solar plant project. Plaintiffs submit there is evidence that Kim was acting in agreement with Jeoung and Matinee because Choi, CEO of Airpark overheard Kim discussing with coconspirators how to divide the Samsun consulting fees–which Plaintiffs had paid or were supposed to pay to Samsun–among themselves. (SSOF ¶31) At his deposition Choi attested that in September 2011, while having a meal with Jeoung, the Samsun Defendants, and Kim, he accidentally overheard a conversation that lead him to believe that Kim was more of a figurehead, and as part of this conversation, "*they* were talking briefly about [] how to divide up the consulting fee among themselves." (Choi Depo. (Doc. 480-2) at 41-42.) While Kim was present at this dinner, Choi's deposition does not establish that he was one of *them*, who was allegedly discussing how to divide up the Samsun consulting fees and/or if Kim was a proposed recipient of the Samsun consulting fee. It is undisputed[9] that Kim did not receive any of the Consortium money

_____

[9] Plaintiffs, without proffering any contrary evidence, dispute Kim's assertion that he did not receive any salary from Matinee and was not reimbursed for his expenses related to his employment with Matinee. Plaintiffs complain that Kim objected to discovery seeking such information. *See e.g.,* SOF (Doc. 480) ¶ 46 Response. Plaintiffs did not file a Motion

paid to Samsun and/or Matinee.   Choi's deposition testimony is, however, an admission that he understood Kim to be a figurehead, not the "brains" of the Matinee Project.  *See* (Chung's SOF, Ex. J (Doc. 470-11): Choi Depo. at 59 (describing Jeoung as being in charge of the business vision and business plans, and there was nothing suspicious about Jeoung).

Plaintiffs challenge Kim's claim of victimization by arguing that contrary to Kim's assertion that he loaned $250,000 to Matinee, the evidence instead reflects that the payment was made pursuant to "shareholders agreements among Lucas Investment Corp. and Kim dated March 2010[,]" and Kim wire transferred $250,000 to Luxchange Corporation on May 28, 2010. (P SSOF ¶ 5) Plaintiff argues that this could support a conclusion that "[t]hus, Mr. Kim was a shareholder of LuxChange, a company related to Matinee, or he commingled his funds with those of a Matinee affiliate. It is undisputed that Lucas Investment Corporation was Matinee's parent company.  (Kim SOF (Doc. 476) ¶ 48 (citing Kim Decl. ¶3)).  Plaintiffs allege that Kim discussed by email with Chung the assignment of the chairmanship of LuxChange to Michael Pannos, former Chairman of Matinee, reporting that Jeoung had "another brilliant idea to justify/solidify our standing which was to assign the chairmanship to Pannos, a former owner of a steel company, with the goal being to add industry experts to the Board, and in this way, to prevent any questions related to LuxChange."  (Response (Doc. 479) at 9 (citing Trial TR 11/18/15 (Doc. 355) at 108:15-24); (P SSOF ¶¶ 4, 19)).

The Court presumes the Plaintiffs' point related to Pannos is to assert Kim's willingness to assist LuxChange, the parent company to Matinee, in creating a façade of legitimacy.  Assuming LuxChange, Lucas Investment, and Matinee are interchangeable, the $250,000 transfer documents relied on by the Plaintiffs, (Kim Decl., Ex. L (Doc. 475-1) at 51-57), do not reflect that shares from either Lucas Investment or LuxChange would issue in exchange for Kim's $250,000 loan approved by Lucas Investment shareholders.  There is no evidence to support the assertion that Kim was a shareholder of Lucas

---

to Compel such discovery, and discovery is closed.  The Court will not presume evidence exists where Plaintiffs had ample opportunity to discover it, but failed to do so.

Investment, LuxChange or Matinee. The evidence reflects he was a lender—nothing more.

At the groundbreaking ceremony for the Matinee Project in Benson, Arizona, on October 27, 2011, Kim and Chung allegedly acted as hosts. (P SSOF ¶ 38.) The Plaintiffs do not explain the relevancy of this fact to the conspiracy claim but perhaps it goes to show that they acted together, i.e., in agreement, or that acting in such important roles, they must have been knowledgeable regarding the illegitimacy of the Matinee Project and, therefore, acting as coconspirators.

Plaintiffs further assert that Kim knew that Matinee's ownership or purchase of land[10] for the Matinee Project was false, (P SSOF ¶ 44 (citing Kim Decl., Ex. B (Doc. 475-1) at 11), or Kim should have directly contacted the land owner to verify the truth of this assertion, (P SSOF ¶ 12). Again, Plaintiffs rely on a newspaper article, the San Pedro Valley News-Sun, March 6, 2012,[11] reporting two groundbreakings, one at the solar field site where Graves owns property, followed by the event at the research and manufacturing location. Plaintiffs submit that Kim also knew at the time of the groundbreaking ceremony that any building or construction permit had yet to be issued to Jes Solar/Airpark Consortium. (P SSOF ¶ 43) (citing (Kim Decl. ¶ 46; Ex. K (Doc. 475-1) at 47-48 (power plant building permit issued on December 28, 2011, to KEPCO KDN); (Conditional Use Permit for generating power plant issued on March 7, 2012 to Whetstone Partners, LLP; Matinee Energy)).

---

[10] The Plaintiffs cite to Kim's Decl. (Doc. 475) ¶ 13, wherein he declared that he became aware that Jeoung had forged his signature "on all land transfer documents relating to Matinee's agreement with Whetstone Partners LLP to develop the Benson site's 9,040 acres for the Matinee Project." The Court notes that this is not evidentiary support for Plaintiff's assertion that allegedly Kim falsely represented to the Plaintiffs that Matinee owned or had purchased the land for the Matinee Project. For purposes of the motions for summary judgment the Court will presume that Kim made the allegedly false representation.

[11] This March 6, 2012, article is not relevant to show what Kim should have known at the time of the groundbreaking ceremony, October 2011. It is inadmissible to prove the truth of the matter asserted, i.e., that there was a groundbreaking ceremony where in fact the property was owned by Graves. For purposes of this motion, however, the Court accepts this fact as true.

- 27 -

1    The Plaintiffs rely on the co-development agreement between Matinee (Whetstone

2    Partnership, LLP (WPL)), and the landowner Ernest L. Graves (ELG) dated August 30,

3    2011, which Kim provided to show his signature was forged on documents related to the

4    purchase of the real property.  (Kim SOF (Doc. 476) ¶21.) This document reflects that the

5    purchase of property for the Matinee Project was done, pursuant to a joint venture

6    agreement, which required the property owner, (ELG), to obtain requisite zoning,

7    permits, etc., to build the solar projects and WPL to do ongoing post-acquisition

8    development until ready for construction—then for WPL and ELG to sell and transfer the

9    projects to Matinee.  The co-development agreement recognized ELG's need for

10   commissions or profits from sale of the "projects," which in the context of the agreement

11   included the initial sale of 9000 acres, to be followed by additional projects of

12   approximately 4,000 or more acres and off-site parcels of approximately 4,700 acres for a

13   total project of 17,700 acres. Matinee would finance the co-development projects,

14   pursuant to separate contracts.  (Kim Decl., Ex. B (Doc. 475-1) at 10-16.)

15   There is no evidence that the Matinee Project could not proceed pursuant to the

16   co-development agreement.  To the contrary, the conditional use/construction permits

17   issued by the City of Benson to WPL suggests that the property acquisition provisions,

18   pursuant to the co-development agreement were sufficient to move forward with the solar

19   plant construction projects.  The co-development agreement did not make the Matinee

20   Project illegitimate in the context of the Matinee Project's need to secure the property.

21   At the time of the ground-breaking ceremony, October 27, 2011, Kim knew

22   Matinee had negotiated the co-development agreement with ELG, the owner of the

23   property for the purpose of constructing the power plant,[12] that ELG, an experienced land

24   development company, was responsible for securing the construction permits.  Kim knew

25   that J.P.Morgan had executed a letter of intent to provide financing for the Matinee

26   Project, including LCs, to be secured by the Benson project, and Matinee had secured the

27   Consortium EPC, with Plaintiffs agreeing to contribute equitably in the Matinee Project.

28   ---

[12] The Court assumes this fact for purposes of deciding summary judgment, noting that
Kim alleges his signature was forged on the WPL ELG co-development agreement.

As for Matinee's ability to contribute equitably to the project, Kim believed that Matinee had $600,000 in equity and a billionaire behind the scenes investor. Like most fraudulent schemes, the Matinee Project looked legitimate, until it didn't.

In October, Kim had seen and signed the Jes Solar/Airpark Consortium EPC contract, which included the requirements for the Consortium to have equity in the project, but by November 2011, Kim had seen and approved Memorandum One, the Consortium contract that sweetened the deal for Plaintiffs because it allowed Plaintiffs to use $8 million from the $16 million LC to be obtained by Matinee for Plaintiffs' equity investment into the Matinee Project. Only then, Plaintiffs tendered $1 million dollars to be placed into a Matinee Project trust account in advance of receiving the anticipated $8 million dollars from the promised LC for the Consortium's equity share of the project. Before then, Plaintiffs had only paid $250,000, $350,000, and $60,000, respectively, at different times, to Defendant Samsun for alleged Matinee Project services. Once the $1 million was tendered, it disappeared quickly: $200,000 to Samsun; $130,000 to NewTech, and $670,000 to Matinee. (SAC (Doc.197) ¶ 70.)

In December, the Consortium contacted J.P.,Morgan directly and found out that there was no LC because Matinee had failed to provide its assets as collateral. The Consortium asked for the return of their money on December 20, 2011.

There is absolutely no evidence that Kim obtained any personal benefit whatsoever from the fraudulently induced payments. This makes it difficult, if not impossible, for the Plaintiffs to establish that Matinee was Kim's alter ego.

Plaintiffs support the alter ego claim against Kim by submitting evidence that allegedly shows he controlled Matinee by appointing Chung as President & CEO of Asia Pacific Rim Division. (Response at 8; P SSOF ¶ 15.) The Plaintiffs rely on an attachment to an email from Kim to Chung, which is a March 31, 2010, letter to Chung from Green Power Management describing schedule milestones for the Matinee Energy Project. At most, this document suggests the Matinee Project would rely on Chung to coordinate

contract awards between consortium constituents and energy projects. (Samil Green Power Management 3/28/10 meeting (Doc. 480-2) at 28.) This fails to place either Chung or Kim in control of Matinee.

Kim readily approved the appointment of Jeoung's wife, Kyung Kim, as the West Regional President, including her having authority over key Matinee trust accounts. Plaintiffs fail to explain the evidentiary value of this appointment, and the Court finds it reflects nothing more than Kim exercising his corporate duties.

Jeoung addressed Kim as "Dear Chief" in Jeoung's email transmittal of the Memorandum One to Kim for signature, (P SSOF ¶ 2), and Plaintiffs include references to other emails from Jeoung to Kim addressing Kim as "Dear Chief, (P SSOF ¶¶ 3, 33, 34, 40), allegedly reflecting that Paul Jeoung and Kim were working level subordinates.

Plaintiffs assert that Kim and Chung used Matinee as their business conduit and pursued their own personal interests or business through the Matinee Project. The Plaintiffs rely on an email from Kim, March 31, 2010, informing Chung that "My [(Mr. Kim's)] thought is to leave out 100 MW to be done ourselves meaning by Il Yang or builders of our choice." (P SSOF ¶ 17.) Kim testified during the damages trial that "if we combine our strength together, me in the United States, him in Korea, we bring the most powerful combination together and merge it, it's going to really explode and we can establish such a platform that we could be the main force in the whole solar power industry in the whole world, the most efficient producer of electricity." (P SSOF ¶ 28 (citing Trial TR 11/18/15 (Doc. 355) at 106:22-107:2)).

The evidence referenced above does not show that Kim signed any agreements other than in his official capacity as Vice President of Matinee, and likewise approved the appointment of Jeoung's wife as President of the Western Division. While he may have recruited Chung to serve as CEO of Asia Pacific Matinee, there is no evidence that the appointment was for Kim's own personal benefit instead of the Matinee Project's benefit. Regardless of Jeoung's reference to Kim as "Dear Chief," by its own admission, the

1 Consortium knew Kim was more of a figurehead and that Jeoung was in charge of
2 Matinee.

3       The Court looked first at the facts alleged against Kim to support Plaintiffs claims
4 because of his role as Vice President of Matinee, but now turns to Defendant Chung,
5 CEO of Asia Pacific Division[13] of Matinee Energy.  It is undisputed that Chung was not a
6 shareholder in Matinee Energy or any Matinee affiliated company, and received no
7 compensation whatsoever from Matinee, except for the cost of his hotel during the
8 groundbreaking ceremony in Benson, Arizona.  (Chung SOF (Doc. 470) ¶ 23.)

9       Plaintiffs support their claims against Chung by asserting he knew everything Kim
10 knew and did everything Kim did.  Plaintiffs rely on the same evidence allegedly
11 supporting the same facts to dispute both Chung and Kim's Motions for Summary
12 Judgment.   The Plaintiffs' logic might prevail, if the Court found that Plaintiffs presented
13 evidence to support the conspiracy and alter ego claims against Kim.  The Court,
14 however, finds otherwise, and Plaintiffs' claims against Chung fail the same reasons the
15 Plaintiffs' claims fail against Kim.

16       The Plaintiffs' Response to Chung's Motion for Summary Judgment bears
17 discussion to the extent Plaintiffs argue that "Chung knowingly and recklessly proceeded
18 to support the Matinee Project by making fraudulent representations to potential
19 construction contractors such as Plaintiffs."  (Response (Doc. 477) at 6, 12.) Plaintiffs
20 assert Chung actively participated in important events to support the Matinee Project,
21 such as acting as host to the groundbreaking ceremonies for the Matinee Project or the
22 KEPCO KDN and Matinee Master Agreement signing ceremony. *Id.* at 13 (citing (P
23 SSOF ¶ 45); Park Decl., Ex C at 4 (picture of Chung appearing at a signing ceremony for
24 Master Agreement between KEPCO KDN and Matinee Energy); Ex. D at 3 (picture of
25 Chung pouring wine at groundbreaking ceremony)).

26
27
28
---
[13] At times, Plaintiffs refer to the Asia Pacific Division as a Matinee affiliate but there is absolutely no evidence whatsoever to suggest that it was anything other than a division of Matinee; it was not a separate entity of any sort.

Plaintiffs assert that the financing strategy for the Matinee Project shows a "tacit understanding" of the conspiracy because it forced construction contractors to take all the project risks by providing the equity investments in the Matinee Project.

"'The easiest situation in which to draw the inference of agreement is where the parties are on the scene together at the same time performing acts in support of one another.'" (Response (Doc. 477) at 18 (quoting *Halberstam v. Welch*, 705 F.2d 472, 481 (D.C. Cir. 1983)). Plaintiffs rely on two instances of joint-conduct: 1) Chung and Kim acted as hosts to the groundbreaking ceremony held in Benson, Arizona, where they made a false representation to the CEO of Airpark that the project financing had been all prepared, (P SSOF ¶¶ 38, 39), and 2) Chung and Kim were together at a meeting with a director of KOTRA (Korea Trade-Investment Promotion Agency), where they executed a Memorandum of Understanding between Matinee and KOTRA to recommend the Matinee Project to small and medium sized South Korean companies, (P SSOF ¶¶ 35, 46). The takeaway, according to Plaintiffs, is that Chung "had at least a *tacit* understanding of his role in their common scheme to defraud Plaintiffs." (Response (Doc. 477) at 18.)

First, in respect to the assertion that Chung had a tacit understanding that his role in the conspiracy was to recommend the Matinee Project to South Korean companies, it is undisputed that he did not recommend the Matinee Project to the Plaintiffs. The pictures proffered by Plaintiffs of Kim and Chung "hosting" the groundbreaking ceremony to show they had a tacit understanding of the conspiracy proves nothing more than what they admit—they were present at the groundbreaking ceremony. The Court rejects that the risky nature of the Matinee Project finance structure as evidence of Defendants' tacit understanding of the conspiracy. First, the Court notes the requirement that the Plaintiffs have an equitable share in the Matinee Project was set out in the contracts, and Plaintiffs paid Defendant Samsum for services allegedly rendered, not as advance equity payments. As for the $1 million dollars that was paid by the Consortium as an advance payment, the Court notes that the Consortium paid it as an advance on the

$8 million it anticipated obtaining pursuant to the $16 million LC, pursuant to the negotiated change in the Memorandum One where Matinee agreed that the LC would include Consortium's equity share. In the end, Plaintiffs Jes Solar/Airpark lost the $1 million advance payment due to fraud, not the allegedly "risky" financing structure for the Matinee Project.

The Court finds that even considering the totality of the facts asserted above that there is no evidence of any tacit understanding by Kim or Chung that the Matinee Project was a fraud. But more importantly, having such a tacit understanding does not suffice. The evidence must clearly establish to a reasonable certainty that Chung and Kim agreed to act with at least one other individual to fraudulently induce the Plaintiffs into making the advance payments to the Matinee Project for the personal gain of any coconspirator. For the same reasons described above in respect to Kim's Motion for Summary Judgment, the Court rejects the Plaintiffs' assertion that: "Chung knowingly and recklessly proceeded to support the Matinee Project by making fraudulent representations . . .."

Plaintiffs assert that Chung and Kim together controlled Matinee, therefore, Matinee was Chung's alter ego as it was Kim's alter ego. This Court has already rejected the assertion that Kim controlled Matinee and the Matinee Project. Plaintiffs offer no new facts or evidence to support the arguments that Chung controlled Matinee. The Court rejects alter ego liability as to Chung for the same reasons the alternative liability doctrine does not apply to Kim. In the Response to Chung's Motion for Summary Judgment, Plaintiffs reassert that they show control by Chung and Kim over Matinee because there is evidence of the two of them discussing using Matinee as a business conduit to direct approximately 100 MW to be done themselves, meaning Il Yang or builders of their choice. In the Response to Chung's Motion for Summary Judgment, Plaintiffs press the argument further: "If the Matinee Project had succeeded, Messrs. Kim and Chung would have had multiple options to realize their economic benefits. (Response (Doc. 477) at 21 (citing e.g. (P SSOF ¶2 (a NewCo' was to be set up as

Matinee's subsidiary "'to manage construction of solar power plant[.]'") The Court notes that the goal of the alleged conspiracy, here, was to NOT construct the solar power plant, but instead to use the construction advance payments for the direct personal benefit of the coconspirators. Plaintiffs are wrong because the alleged conspiracy precluded Chung and Kim from ever being a business conduit for builders.

In short, the Plaintiffs present only two instances where there was an alleged direct representation made by Chung to the Plaintiffs: 1) at the groundbreaking ceremony in Benson, October 27, 2011,Chung made a false representation to Jes Solar/Airpark Consortium, "agreeing with Kim's statement that the project financing had been all prepared," (SSOF ¶¶ 38-39), and 2) at a meeting in his office in Seoul, South Korea, December 15, 2010, he advised Hankook to retain Lim, Ruger & Kim, LLP, to review certain legal aspects of the Matinee Project (P SSOF ¶ 46), and "confirmed that the Matinee Project was proceeding as planned," (P Controverting SOF (Doc. 478) ¶ 52 (Undisputed).

For all of the reasons this Court grants summary judgment for Kim, it grants summary judgment for Chung. There must be clear and convincing evidence of an actual agreement to participate in allegedly tortious conduct. Here, the alleged tortious conduct was to make false statements to induce the Plaintiffs to make advance payments to the Matinee Project for the personal use of the coconspirators, rather than the construction of the Matinee Project. After nearly six years of litigation, the Plaintiffs lack any evidence of any agreement for an unlawful purpose to support the conspiracy claim.

The Court does not reach Defendant Kim's argument that the economic loss rule bars Plaintiff's recovery. The Court does not reach Defendant Chung's argument that the intra-corporate conspiracy doctrine bars the Plaintiff's recovery. The Court denies the Motion to Strike aspects of the Plaintiffs' evidence as being inadmissible. The Court has considered each and every piece of evidence relied on by the Plaintiffs to support the factual assertions made to rebut the motions for summary judgment. Even considering

the arguably inadmissible evidence, the Plaintiffs' claims fail.  The Motion to Strike is moot.

**Accordingly,**

**IT IS ORDERED** that Chung's Motion for Summary Judgment (Doc. 469) is GRANTED.

**IT IS FURTHER ORDERED** that Kim's Motion for Summary Judgment (Doc. 471) is GRANTED.

**IT IS FURTHER ORDERED** that the Motion to Strike (Doc. 487) is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

Dated this 1st day of July, 2019.

Honorable David C. Bury
United States District Judge